**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
**Kelsie G. Crippen, OSB #193454**
KelsieCrippen@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085

**Alexander LaCroix** (*pro hac vice* to be filed)
ALaCroix@lewisroca.com
**John C. Gray** (*pro hac vice* to be filed)
JGray@lewisroca.com
**Lewis Roca Rothgerber Christie LLP**
201 East Washington Street, Suite 1200
Phoenix, AZ  85004
Telephone: (602) 262-5311

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ECOSHIELD PEST SOLUTIONS PORTLAND, LLC,<br><br>                                 Plaintiff,<br><br>    v.<br><br>GRIT MARKETING, LLC; ZACHARY SEAGER; and CORBIN HANSEN,<br><br>                              Defendants. | Case No. 3:24-cv-00887<br><br>**COMPLAINT**<br><br>**Tortious Interference with Economic Relations; Price Discrimination O.R.S. § 646.040; Special Payments to Customers O.R.S. § 646.070; Inducing Price Discrimination O.R.S. § 646.090; Prohibition of Monopolies O.R.S. §§ 646.730, 646.780; Monopolizing Trade 15 U.S.C. §§ 2, 15**<br><br>**JURY TRIAL DEMANDED** |

**Page 1 –**      **COMPLAINT**

Plaintiff EcoShield Pest Solutions Portland, LLC, for its Complaint against Grit Marketing, LLC; Zachary Seager; and Corbin Hansen (together, "Defendants"), alleges as follows:

## INTRODUCTION

1.    Plaintiff and its affiliates (collectively, "Shield") are in the door-to-door sales business, primarily providing extermination and pest-control services for homes and businesses across the country and recruiting door-to-door salespeople ("Direct Sellers") to sell these services.[1]

2.    Defendant Grit Marketing, LLC ("GRIT") is also in the door-to-door or "D2D" sales industry.

3.    As reflected on its website, GRIT "is a direct-to-home sales organization that contracts its sales teams to established pest control companies across the United States."

4.    In other words, GRIT provides door-to-door sales services for pest-control companies that cannot or choose not to manage door-to-door sales themselves.

5.    Defendant Zachary Seager ("Seager") touts himself on social media as the "D2D Sales Record Holder" and Regional Manager of GRIT.

6.    Seager also touts himself as having a "downline"—*i.e.*, a team of salespeople he has recruited to GRIT—that sold more than $7 million of services in 2023.

7.    Defendant Corbin Hansen ("Hansen") is a sales representative for GRIT and is a member of Seager's team.

---

[1] This Complaint uses the defined term "Direct Sellers" to mean and include any direct sellers who have contracted with Shield at any time.

8.      On information and belief, Hansen earned approximately $80,000 in a single summer as a rookie salesperson for GRIT at the age of 17 and was rewarded by GRIT (on top of his $80,000 in commissions) with a brand-new Ford F-150 Raptor pickup truck.

9.      Over at least the past several weeks, Defendants (directly and through their agents and/or co-conspirators, all of whom are GRIT employees (collectively, "Team Members")) have orchestrated and continue to engage in an unlawful and anti-competitive effort to interfere with Shield and its Direct Sellers in and around Portland, Oregon, and other parts of western Oregon (collectively, the "Portland Market").

10.     On April 23, 2024, Seager posted a clip from his interview on the "Summer Sales Podcast" where he analogized D2D sales in Portland as a "battle" and himself as the "general."

11.     Seager described GRIT's activities on Memorial Day, which he referred to as "The Rumble," and the combination of Rein energy drinks, Red Bull energy drinks, pre-workout supplements, Powerade, and dry ice that GRIT encourages its Team Members to drink before they are deployed to engage in D2D sales.

12.     In Seager's words, "we pour [Rumble Punch] out into cups for everyone, we're all drinking it. I get on the doors and my whole hand is like…I'm trying to show a customer the price and my whole hand is just shaking…"

13.     In a video created on or around May 26, 2024, and posted to an Instagram account for "grit.portland," a large group of GRIT Team Members stands illuminated by the lights from their cell phone cameras, while a man shrieks a chant: "tomorrow is Memorial Day!...tomorrow I'm getting Benjamins!...we're so lit we got Drew flying in…let's celebrate baby this is the last dance!..."

**Page 3 –      COMPLAINT**

14. As the foregoing chant proceeds, multiple GRIT Team Members are shown, their hands covered in blood or a red liquid intended to resemble it, pressing their palms onto a large white bedsheet to create a macabre banner of toxic brotherhood.

15. In another Instagram video created on or around May 27, 2024, and labeled "Portland" at "7:00 a.m.," GRIT Team Members can be seen watching a man tagged as "@drewhansen" gargling Powerade and spitting it into a white cooler of "Rumble Punch" before another GRIT Team Member shakes the contents of the cooler to prepare it for consumption by other GRIT Team Members.

16. Worked into a frenzy by GRIT's leadership and unleashed immediately throughout communities in Portland and surrounding areas, Defendants and their Team Members have behaved in the manner intended, perpetrating a slew of illegal behavior over the past several weeks.

17. Specifically, and among other things, Defendants and their Team Members have:

   a. Followed Shield Direct Sellers from door to door and have actively interfered with their sales efforts by interrupting conversations with prospective customers;

   b. Defamed Shield and its Direct Sellers by lying to customers about Shield, the Direct Sellers, and their services;

   c. Paid kickbacks and made other special payments to certain Shield customers to cover cancellation fees in an effort to switch their accounts to GRIT's clients;

   d. Engaged in bad-faith price discrimination and sold their clients' services at a loss in order to drive Shield out of the Portland Market;

  e.  Stalked a female Direct Seller four days in a row while she was alone, including when she left and returned to a neighborhood after using the restroom and late in evening when it was dark, to the point she considered bringing a rape whistle with her the following day;

  f.  On at least one occasion, stalked a male Direct Seller and relentlessly directed homophobic slurs and similar demeaning and disparaging language toward him; and

  g.  On at least one occasion, physically assaulted and battered a Shield Direct Seller.

18. Indeed, Defendants and their Team Members have admitted, on camera, that:

  a.  They have "kicked out" multiple other door-to-door and pest-control companies from the Portland Market;

  b.  They intend to do the same to Shield; and

  c.  They are actively training their Team Members to engage in the above-referenced behavior during the summer sales season.

19. The door-to-door sales season for pest-control services is unique in that it is primarily limited to the summer, roughly from the end of April to the end of August each year.

20. As an industry standard, pest-control service contracts signed during the summer sales season generally include one-year terms.

21. In other words, the sales for pest-control services made during the summer sales season make up a significant amount of the industry's overall sales for the year.

22. A productive summer sales season is therefore critical to a successful year in the door-to-door pest-control services industry.

**Page 5 –**  **COMPLAINT**

23.     In turn, short-term efforts to monopolize a market during the summer sales season are likely to have significant, lasting, and outsized effects in the longer term.

24.     Defendants are aware of this and, for this reason, are attempting to bully Plaintiff out of the Portland Market during the limited time of the summer sales season.

25.     In light of the foregoing, the other facts set forth herein, and other facts to be revealed through discovery, Defendants are liable to Plaintiff for damages to be determined at trial, totaling at least $1 million, plus treble damages, attorneys' fees, and other relief, including injunctive relief.

## PARTIES, JURISDICTION, AND VENUE

26.     Plaintiff is an Arizona limited liability company that provides pest-control services in the Portland Market and has contracts and business expectancies with Direct Sellers, customers, and prospective customers who were targeted by Defendants' improper conduct.

27.     GRIT is a Utah limited liability company that operates and does business in and around Portland, Oregon, and elsewhere.

28.     On information and belief, Seager is domiciled in and is a resident of Utah but has engaged in and continues to engage in door-to-door sales in the Portland Market, and, on information and belief, leads a GRIT sales team in the Portland Market.

29.     On information and belief, Hansen is domiciled in and is a resident of Utah but has engaged in and continues to engage in door-to-door sales in the Portland Market, and, on information and belief, has trained GRIT sales members in the Portland Market.

30.     This Court has personal jurisdiction over each Defendant because the acts alleged in this Complaint occurred in and caused damages to Plaintiff in and around Portland, Oregon.

31.     Additionally, Defendants have directed their activities toward Oregon and purposefully availed themselves of the benefits of Oregon law.

32.     Plaintiff and Defendants are engaged in interstate commerce in connection with the business operations at issue in this action, and Defendants' conduct has had and continues to have a significant impact on interstate commerce.

33.     Jurisdiction and venue are proper in this Court pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1367, and 1391(b)(2).

**DEFENDANTS' WRONGFUL CONDUCT**

34.     Defendants are engaged in an unlawful and anti-competitive campaign to interfere with Plaintiff's pest-control business and to stalk and harass Plaintiff's Direct Sellers in the field.

35.     In May 2024 alone, GRIT's sales representatives—at the direction of Seager and Hansen—stalked, verbally harassed, and interfered with Plaintiff's Direct Sellers dozens of times.

36.     This is an organized effort to undermine Plaintiff's operations in the Portland Market, with a specific goal of attacking Plaintiff's revenues and ability to continue business in the area during and after the summer sales season (when most door-to-door sales of pest-control services are completed for the year).

37.     Several of these interactions were recorded, and each one shows that GRIT— through Seager and Hansen—trained its sales representatives to target other pest-control companies, including Plaintiff.

38.     Defendants coached their representatives to stalk Plaintiff's Direct Sellers as they moved through different neighborhoods and interrupt them while they sold pest-control services.

39.    Defendants instructed their sales representatives to illegally pay the cancellation fees for Plaintiff's customers to switch their accounts to GRIT's clients, and confirmed that GRIT would sell accounts at a loss to undermine Shield's sales.

40.    Defendants' unlawful and tortious behavior includes but is not limited to the following examples:

    a.    On or about May 2, 2024, Seager located, stalked, and interrupted one of Plaintiff's Direct Sellers in the Portland Market; stated that he would pay the cancellation fees of any of Plaintiff's customers to switch over to GRIT's pest-control clients and that he would "go negative" on the customer accounts, meaning that he and/or GRIT's clients would lose money on the services sold; and falsely represented to a customer that Shield and the Direct Seller did not service any households in the customer's neighborhood.  In addition, Seager physically pushed the Direct Seller in an apparent effort to threaten and intimidate him.

    b.    On or about May 10, 2024, an unidentified GRIT sales representative confronted another Direct Seller in the Portland Market, explaining that— pursuant to training and instructions from Seager and Hansen—he would pay cancellation fees and "go negative" on accounts, and that he would intentionally interrupt the Direct Seller's sales pitches to prospective customers.

    c.    On or about May 14, 2024, a GRIT sales representative named Braxton followed a Direct Seller in the Portland Market; reiterated the same scheme; admitted that he had, on at least one occasion, paid over $1,000 in

cancellation fees in a single day to customers of Defendants' competitors; and explained that the goal was to get the competitors, including Plaintiff, to leave the Portland Market.

d.      On or about May 14, 2024, a GRIT sales representative named Cole confronted a Direct Seller in the Portland Market and reiterated the same message, stating, "I'll knock behind you, in front of you, dude, I'll pay your cancel fees."

e.      On or about May 15, 2024, a GRIT sales representative named Dawson stalked and confronted a Direct Seller in the Portland Market; admitted that he was specifically instructed to follow and interfere with any Direct Sellers in his "hood" (the geographic area he was assigned as his sales territory by GRIT); indicated that he would "bagel," or sell nothing, if it meant forcing Plaintiff and its Direct Sellers out of his territory; explained that he would pay Plaintiff's cancellation fees to get customers out of Plaintiff's contracts so that GRIT could take the accounts; and explicitly acknowledged GRIT's anti-competitive strategy, boasting: "We already kicked out Insight [Pest Solutions], Brooks [Pest Control], Saela [Pest Control]—all those guys have moved market."

f.      On or about May 14, 15, 16, and 17, 2024, a female Direct Seller working for Plaintiff was stalked and harassed by three different GRIT representatives but was too scared to record the interactions.  This female Direct Seller was followed upon returning to the neighborhood after taking a restroom break and was again followed into the night while it was dark

out.  She felt uncomfortable being following by men she did not know while in the dark and in unfamiliar environments.  Based on these interactions, she considered bringing a rape whistle with her to protect herself.

41.     Defendants and their Team Members have repeatedly boasted about their unlawful and anti-competitive conduct, claiming that they were "trying to take all of Portland" and that they were "going to be the greatest team of all time, and the way that happens is kicking everybody out of Portland."

42.     In fact, Dawson, one of Defendants' Team Members, admitted that Defendants cannot meet their sales goals without resorting to such underhanded and illegal tactics, explaining:

    a.      "This team plans to put up like $20 million in revenue over the whole year, and the way we do that is if you guys [Plaintiff, its Direct Sellers, and other companies] don't sell accounts in Portland."

    b.      "If we really do want to put up the numbers that we do plan on putting up, we gotta kick everybody out. … This is corporation versus corporation."

    c.      "You gotta stomp out the competition to make sure you fly high."

43.     Defendants even punish sales representatives who do not engage in this unlawful and anti-competitive behavior.

44.     Indeed, as Dawson explained: "I have to [do this] for the team; if I don't, I get shit on," and "if [Defendants] find out I was with an EcoShield [Direct Seller] and I shared my hood, I go home, I get sent home."

45.     Defendants have caused, and continue to cause, immediate and irreparable injury, loss, and damage to Plaintiff and have caused and continue to cause physical harassment and even assault and battery to Plaintiff's Direct Sellers.

46.     Among other things, Plaintiff's Direct Sellers have been forced out of certain Portland neighborhoods and territories and have sold in outlying geographic areas that are more difficult and expensive to service and less profitable overall.

47.     Any delay in enjoining Defendants from their tortious, unlawful, and anti-competitive conduct is likely to render a final judgment ineffectual.

48.     Plaintiff is entitled to the relief demanded in this pleading based on the merits, including restraining the commission and continuance of Defendants' conduct.

## COUNT ONE

## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS

### (Against All Defendants)

49.     Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

50.     Plaintiff is in the business of door-to-door pest-control sales and services.

51.     Plaintiff has business relationships with existing pest-control customers and prospective relationships with potential pest-control customers (collectively, "Business Relationships").

52.     Defendants are unaffiliated with Plaintiff.

53.     Defendants and their Team Members continue to target and intentionally interfere with Plaintiff's Business Relationships.

54.     Defendants and their Team Members interfered by improper means.

55.     Defendants and their Team Members interfered with an improper motive.

56.     Defendants and their Team Members have aggressively stalked and continue to stalk Plaintiff's Direct Sellers during their sales activities to destroy Plaintiff's Business Relationships and goodwill.

57.     Defendants and their Team Members paid and continue to pay cancellation fees for Plaintiff's customers to cancel their accounts with Plaintiff and switch to GRIT.

58.     Defendants and their Team Members engaged in the foregoing misconduct in an intentional effort to drive Plaintiff (and other pest-control companies) out of the Portland Market.

59.     The intentional interference of Defendants and their Team Members destroyed and continues to destroy Plaintiff's Business Relationships, making it increasingly impracticable to carry on business in the Portland Market.

60.     Each of the Defendants engaged in tortious conduct for which they are individually liable to Plaintiff.

61.     Each of the Defendants knew that the other Defendants and their representatives were going to engage in such tortious conduct.

62.     Each of the Defendants provided substantial assistance or encouragement to the other Defendants and their representatives with the intent of promoting the tortious conduct.

63.     Defendants jointly conspired to, agreed to, and did interfere with Plaintiff through an overt campaign of tortious interference with contracts and business expectancies, price discrimination, special payments to customers, and other unlawful anti-competitive business practices.

64.     Plaintiff has sustained actual and consequential damages as a direct and proximate cause of Defendants' concerted, unlawful, and wrongful conduct in an amount to be proven at trial, totaling at least $1 million.

## COUNT TWO

## PRICE DISCRIMINATION (O.R.S. § 646.040)

### (Against All Defendants)

65.     Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

66.     Defendants are engaged in the door-to-door sales of pest-control services in the Portland Market.

67.     Defendants discriminated in price between different purchasers of pest-control services.

68.     Defendants directly and/or indirectly discriminated in price between residential consumers of pest-control services by "go[ing] negative" on certain residential pest-control customer accounts.

69.     Defendants are only willing to "go negative" for (and thus discriminate in price in favor of) those residential pest-control consumers that Defendants know or believe to be existing or prospective customers of Plaintiff, while charging greater prices to all other consumers in other communities or portions of communities where Plaintiff is not selling and/or where Defendants have successfully driven Plaintiff and other pest-control companies out of the community.

70.     Defendants' discrimination was done in bad faith, substantially lessened competition, and tended to create a monopoly in door-to-door sales of pest-control services in the Portland Market.

71.     Defendants' discrimination injured, destroyed, and prevented competition for customers of door-to-door pest-control services.

72.     Plaintiff (along with certain of its existing and prospective customers) has sustained actual and consequential damages as a direct and proximate cause of Defendants' concerted, unlawful, and wrongful conduct in an amount to be proven at trial, totaling at least $1 million.

## COUNT THREE

## SPECIAL PAYMENTS TO CUSTOMERS (O.R.S. § 646.070)

### (Against All Defendants)

73.     Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

74.     Defendants are engaged in the door-to-door sales of pest-control services in the Portland Market.

75.     Defendants have made and continue to make cash payments, on behalf of and for the benefit of GRIT's clients, to Plaintiff's customers to cancel their existing contracts with Plaintiff and induce them to sign a contract for pest-control services through GRIT.

76.     Such payments have been and are being made in the course of GRIT's commercial operations as compensation or in consideration for services furnished by or through GRIT's clients in connection with the sale or offering for sale of services.

77.     Such cash payments are not available on proportionally equal terms to all other customers competing in the distribution of such services.

78.     Plaintiff (along with certain of its existing and prospective customers) have sustained actual and consequential damages as a direct and proximate cause of Defendants' concerted, unlawful, and wrongful conduct in an amount to be proven at trial, totaling at least $1 million.

**COUNT FOUR**

**INDUCING PRICE DISCRIMINATION (O.R.S. § 646.090)**

**(Against All Defendants)**

79.     Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

80.     Defendants are engaged in the door-to-door sales of pest-control services in the Portland Market.

81.     Defendants have knowingly induced price discrimination prohibited by O.R.S. §§ 646.040 to 646.080.

82.     Plaintiff (along with certain of its existing and prospective customers) have sustained actual and consequential damages as a direct and proximate cause of Defendants' concerted, unlawful, and wrongful conduct in an amount to be proven at trial, totaling at least $1 million.

///

///

///

## COUNT FIVE

## PROHIBITION OF MONOPOLIES (O.R.S. §§ 646.730, 646.780)

### (Against All Defendants)

83.     Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

84.     Defendants are engaged in the door-to-door sales of pest-control services in and around Portland, Oregon.

85.     Defendants have monopolized the market for door-to-door sales of pest-control services in the Portland Market.

86.     In the alternative, Defendants have attempted to monopolize the market for door-to-door sales of pest-control services in the Portland Market.  To accomplish their monopolization, Defendants have conspired with their Team Members and committed the acts set forth above.

87.     For example, Defendants have "go[ne] negative" on their sales accounts—*i.e.*, they have sold or offered to sell pest-control services below cost.

88.     On information and belief, Defendants have sold below cost as to their own services, meaning that Defendants and their Team Members have provided door-to-door sales services for their pest-control-company clients but have waived their commissions for such work and/or have made payments to customers that, in combination, exceed the marginal or variable average cost of such services.

89.     On information and belief, Defendants have also sold below cost as to the services of their clients, meaning that Defendants and their Team Members have offered pest-control contracts to residential consumers below the marginal or average variable cost to be incurred by

Defendants' pest-control-company clients in connection with the provision of services to the residential consumers.

90.    Defendants' predatory pricing and/or bidding has been knowingly and willfully undertaken with the express purpose of monopolizing the door-to-door pest-control sales market in the Portland Market, and created a dangerous probability that Defendants would recoup their losses from below-cost sales in future supra-competitive transactions.

91.    Plaintiff (along with certain of its existing and prospective customers) have sustained actual and consequential damages as a direct and proximate cause of Defendants' concerted, unlawful, and wrongful conduct in an amount to be proven at trial, totaling at least $1 million.

92.    Pursuant to O.R.S. § 646.780(1)(a), Plaintiff is entitled to an award of treble damages.  Plaintiff is also entitled to recover attorney fees pursuant to O.R.S. § 646.780(3)(a).

## COUNT SIX

## MONOPOLIZING TRADE (15 U.S.C. §§ 2, 15)

### (Against All Defendants)

93.    Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

94.    Defendants are engaged in the door-to-door sales of pest-control services in and around Portland, Oregon.

95.    Defendants have monopolized the market for door-to-door sales of pest-control services in the Portland Market.

96.    In the alternative, Defendants have attempted to monopolize the market for door-to-door sales of pest-control services in the Portland Market.

97.     Defendants have "go[ne] negative" on their sales accounts—*i.e.*, they have sold or offered to sell pest-control services below cost.

98.     On information and belief, Defendants have sold below cost as to their own services, meaning that Defendants and their Team Members have provided door-to-door sales services for their pest-control-company clients but have waived their commissions for such work and/or have made payments to customers that, in combination, exceed the marginal or variable average cost of such services.

99.     On information and belief, Defendants have also sold below cost as to the services of their clients, meaning that Defendants and their Team Members have offered pest-control contracts to residential consumers below the marginal or average variable cost to be incurred by Defendants' pest-control-company clients in connection with the provision of services to the residential consumers.

100.    Defendants' predatory pricing and/or bidding has been knowingly and willfully undertaken with the express purpose of monopolizing the door-to-door pest-control sales market in the Portland Market, and created a dangerous probability that Defendants would recoup their losses from below-cost sales in future supra-competitive transactions.

101.    Plaintiff (along with certain of its existing and prospective customers) have sustained actual and consequential damages as a direct and proximate cause of Defendants' concerted, unlawful, and wrongful conduct in an amount to be proven at trial, totaling at least $1 million.


///

///


**Page 18 –      COMPLAINT**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.      A temporary restraining order and preliminary and permanent injunction enjoining Defendants and all other persons acting in concert and participation with Defendants from (i) engaging in anti-competitive behavior and unlawful price discrimination in violation of the Oregon Anti-Price Discrimination Law, O.R.S. §§ 646.010 to 646.180, and Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; and (ii) stalking, harassing, assaulting, battering, or otherwise attempting to intentionally interfere with Plaintiff's Direct Sellers in Oregon;

B.      Compensatory and other damages in an amount to be determined at trial, totaling at least $1 million;

C.      Treble damages, on Counts Two, Three, Four, Five, and Six, for Defendants' anti-competitive behavior and unlawful price discrimination, pursuant to the Oregon Anti-Price Discrimination Law, O.R.S. § 646.140, Oregon Antitrust Laws, O.R.S. § 646.780(1)(a), and the Sherman Antitrust Act, 15 U.S.C. § 15;

D.      Reasonable attorneys' fees, on Counts Four, Five, Six, and Seven, pursuant to the Oregon Anti-Price Discrimination Law, O.R.S. § 646.140, O.R.S. § 646.780. and the Sherman Antitrust Act, 15 U.S.C. § 15;

E.      Pre- and post-judgment interest, at the highest rate allowable by law;

F.      Plaintiff's costs of suit; and

G.      Such other and further relief as the Court deems just and proper.


///

///


**Page 19 –      COMPLAINT**

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


DATED:  May 31, 2024.          MARKOWITZ HERBOLD PC


*s/ Lauren F. Blaesing*
Lauren F. Blaesing, OSB #113305
LaurenBlaesing@MarkowitzHerbold.com
Kelsie G. Crippen, OSB #193454
KelsieCrippen@MarkowitzHerbold.com

LEWIS ROCA ROTHGERBER CHRISTIE LLP
Alexander LaCroix (*pro hac vice* to be filed)
ALaCroix@lewisroca.com
John C. Gray (*pro hac vice* to be filed)
JGray@lewisroca.com
*Attorneys for Plaintiff*

2151518.6