IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ECOSHIELD PEST SOLUTIONS
PORTLAND, LLC,

                       Plaintiff,

       v.

GRIT MARKETING, LLC,
ZACHARY SEAGER, AND CORBIN
HANSEN,

                     Defendants.

Case No. 3:24-CV-00887-AB

OPINION AND ORDER

**BAGGIO, District Judge:**

## I. INTRODUCTION

Plaintiff EcoShield Pest Solutions Portland, LLC ("Plaintiff"), an affiliate of the national EcoShield pest solutions brand, entered Portland, Oregon's competitive pest-control services market in early 2024. In this lawsuit, Plaintiff alleges that Defendants Grit Marketing, LLC ("Grit"), Zachary Seager, and Corbin Hansen (collectively, "Defendants") tortiously interfered with economic relations and violated the Sherman Act and Oregon Anti-Price Discrimination Law ("OAPDL") by monopolizing trade and otherwise unlawfully interfering with Plaintiff's pest-control services sales. Defendants move to dismiss Plaintiff's Complaint for failure to state a claim, or, in the alternative, move to dismiss Plaintiff's Sherman Act claim (Count Six)—the sole federal-law claim in this case—under Rule 12(b)(6) and to dismiss Plaintiff's remaining state law claims

for lack of subject matter jurisdiction under Rule 12(b)(1). Motion to Dismiss ("Mot. to Dismiss", ECF 19), 1. Defendants also request that the Court take judicial notice under Federal Rule of Evidence 201 of fifteen exhibits, an issue the Court resolves first since it informs the record as to Defendants' Motion to Dismiss. Request for Judicial Notice ("RJN", ECF 20), 1–3. For the reasons discussed below, the Court DENIES Defendants' Request for Judicial Notice, and the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss.

## II. BACKGROUND

Plaintiff and its affiliates provide extermination and pest-control services for homes and businesses, using door-to-door salespeople to generate business. ("Compl.", ECF 1), ¶¶ 1, 26. Plaintiff recently entered the Oregon pest-control market, but its affiliates operate in multiple states. *Id.* ¶ 1. Defendant Grit provides door-to-door sales services for pest-control companies that, for whatever reason, cannot provide this form of marketing themselves. *Id.* ¶¶ 3–4. Defendant Grit does not itself provide pest-control services. *See id.* Defendant Seager is a Regional Manager for Defendant Grit, and Defendant Hansen is a sales representative for Defendant Grit and a member of Defendant Seager's team. *Id.* ¶¶ 5, 7. Plaintiff claims that Defendant Grit, through its salespeople, has engaged in unlawful and anti-competitive sales practices to force Plaintiff out of the Portland pest-control market. *Id.* ¶ 9.

Plaintiff alleges that Defendant Grit "work[s]" its salespeople "into a frenzy" and "unleashe[s]" them into communities in and around Portland. *Id.* ¶ 16. Specifically, Plaintiff alleges that Defendant Grit has engaged in the following behavior: (1) following Plaintiff's salespeople as they go door to door and actively interfering with sales efforts by interrupting conversations with prospective customers, (2) lying to prospective customers about Plaintiff and its services, (3) selling their client's services at a loss by paying Plaintiff's customers' cancellation

fees as part of an effort to persuade the customers to switch their accounts to Defendant Grit's clients, (4) engaging in bad-faith price discrimination, (5) stalking one of Plaintiff's female salespeople for four days in a row, (6) stalking and using homophobic language toward one of Plaintiff's male salespeople, and (7) physically assaulting and battering one of Plaintiff's salespeople. *Id.* ¶ 17.

Plaintiff claims that Defendants have admitted on camera that they have "kicked out" other pest-control companies from the Portland market and intend to do the same to Plaintiff by training their salespeople to use the above-alleged behaviors. *Id.* ¶ 18. Plaintiff states that the bulk of pest-control sales happens between April and August, meaning that a successful summer sales season is critical for a successful year in the door-to-door pest-control services industry. *Id.* ¶¶ 19–22. Thus, Plaintiff alleges that "short-term efforts to monopolize a market during the summer sales season are likely to have significant, lasting, and outsized effects in the long-term" and that Defendants are trying to "bully Plaintiff out of the Portland Market during the . . . summer sales season" for this reason. *Id.* ¶¶ 23–24.

Plaintiff filed its Complaint on May 31, 2024, alleging common law, OAPDL, and Sherman Act claims against Defendants. *See generally* Compl. A few days later, Plaintiff filed a motion for a Temporary Restraining Order seeking to enjoin Defendants from: (1) interfering with Plaintiff's door-to-door pest-control salespeople in Oregon and/or (2) engaging in anti-competitive behavior and unlawful price discrimination. Motion for Temporary Restraining Order ("Mot. TRO", ECF 4), 1. This Court granted the TRO in part, concluding that Plaintiff was likely to succeed on the merits of its Oregon state law claims and had "at least raised serious questions on the merits of a monopolization claim." June 5, 2024, Opinion and Order (ECF 11), 5–8. This Court subsequently granted the parties' Stipulated Motion for Entry of Preliminary Injunction. *See*

*generally*, June 12, 2024, Opinion and Order (ECF 15). Accordingly, Defendant Grit is, until the conclusion of this matter, "enjoined from coming within 50 feet of any persons wearing EcoShield-branded clothing." *Id.* at 4.

### III. STANDARDS

#### A. Request for Judicial Notice

When considering a motion to dismiss, the court's scope is "limited to the contents of the complaint" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006), but it may consider evidence subject to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (a court may take judicial notice of and consider matters of public record without converting a motion to dismiss into a motion for summary judgment). Under Federal Rule of Evidence 201, a court may take judicial notice of matters of public record. The court, however, may only take judicial notice of undisputed matters of public record; it "may not take judicial notice of a fact that is 'subject to reasonable dispute'" *Lee*, 250 F.3d at 689 (quoting Fed. R. Evid. 201(b)), or that is irrelevant to resolving the pending motion. *See Ruiz v. City of Santa Monica*, 160 F.3d 543, 548 n. 13 (9th Cir. 1998).

#### B. Motion to Dismiss

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) is to test a claim's sufficiency. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to dismiss, an antitrust complaint 'need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws.'" *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1136 (9th Cir. 2022) (quoting *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996)). That said, because of the cost of the discovery and the opportunity for a plaintiff to "extort large settlements even where he does not have much

of a case[,]" well-pleaded factual allegations are especially important in antitrust cases. *Kendall v. Visa U.S.A.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). At the motion to dismiss stage, a court accepts all facts in the non-moving party's favor. *Dreamstime.com*, 54 F.4th at 1136.

## IV. DISCUSSION

Plaintiff brings an Oregon law common law tortious interference with economic relations claim (Count One) along with Oregon and Federal statutory anticompetition claims[1]—OAPDL claims (Counts Two through Five) and a Sherman Act claim (Count Six)—against Defendants. Compl., ¶¶ 49–101.

## A.  Judicial Notice

Defendants request that the Court take judicial notice of materials downloaded from websites of Defendant Grit, Plaintiff, other pest-control companies, and governmental agencies. Plaintiff does not dispute the accuracy of its own website. Plaintiff, however, objects to the Court taking judicial notice on the grounds that the documents are "irrelevant and otherwise objectionable[.]" Response to Defendants' Motion to Dismiss ("Resp.", ECF 24), 14; *see also* Transcript of December 17, 2024, Hearing ("Tr.", ECF 31), 4:25–5:7. Defendants contend that they do not offer the materials to contradict facts alleged in the Compliant, and that the Court should take judicial notice of the materials because they "don't actually contradict anything that [Plaintiff has] alleged." Tr., 19:14–20:7.

As to Exhibits 1–3, 5–9, and 11, the Defendants ask the Court to take judicial notice of the materials from Defendant Grit's and Plaintiff's websites, the Arizona Corporation Commission's

---

[1] The statutory claims are price discrimination under ORS 646.040, special payments to customers under ORS 646.070, inducing price discrimination under ORS 646.090, monopolization under ORS 646.730 and 646.780, and monopolizing trade under 15 U.S.C. §§ 2, 15.

database entries of EcoShield Pest Solutions, and the Oregon Department of Agriculture's procedure for Pesticide licensing requirements and obtaining such a license. While a court may take judicial notice of information found on the internet, "'private corporate websites, particularly when describing their own business, generally are not the sorts of sources whose accuracy cannot reasonably be questioned.'" *Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 763 (C.D. Cal. Sept. 28, 2015) (quoting *Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3d Cir.2007)). Accordingly, the Court declines to take judicial notice of Plaintiff's and Defendant's websites. The Court also declines to take judicial notice of the entries from Oregon and Arizona websites because the court finds that the facts to be noticed are irrelevant and not needed to resolve Defendants' motion to dismiss. *Ruiz v. City of Santa Monica*, 160 F.3d 543, 548 n.13 (9th Cir. 1998).

As to Exhibit 4, Defendants appear to request that the Court judicially notice Plaintiff's application for authority to operate in Portland, dated January 19, 2024, for the purpose of establishing that there are not significant barriers to entry for new pest-control companies into the Portland Market. *See* Mot. to Dismiss, 12. This essentially asks the Court to consider extrinsic evidence to resolve a disputed issue and is relevant to whether Plaintiff can state a claim. *See Lee*, 250 F.3d at 690 (on a motion to dismiss, inferences must be drawn in the non-moving party's favor). Such a request is improper, and the Court declines to take judicial notice of Exhibit 4.

As to Exhibits 10 and 12–15, Defendants ask the Court to take judicial notice of the Oregon Department of Agriculture's online database of licensed Commercial Pesticide Operators and of the websites of four pest-control companies operating in Portland—Aptive Environmental, Terminex, Saela, and Orkin—for the purpose of showing, among other things, that there are hundreds of licensed Commercial Pesticide Operators in Oregon. Mot. to Dismiss, at 4–5. Defendants then assert that "Plaintiff does not allege which of these hundreds of businesses is

Grit's client in the alleged Portland Market." *Id.* The Court finds that this request asks the Court to use extrinsic evidence to determine a disputed issue—whether Plaintiff can show that Defendants possess a market share sufficient to constitute monopoly power—and finds this request improper. *See Dreamstime.com,* 54 F.4th at 1137 (market share is the most important element to consider in determining if monopoly power exists). Accordingly, the Court declines to take judicial notice of Exhibits 10 and 12–15.

**B. Defendant's Motion To Dismiss**

Defendant moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss each of Plaintiff's claims. This Opinion first analyzes the motion as to the Monopolization of Trade claims (Counts Five and Six), then the OAPDL claims (Counts Two through Four) and lastly the Tortious Interference with Economic Relations claim (Count One).

### 1.    Monopolizing Trade Under 15 U.S.C §§ 2, 15 and Oregon Law— Counts Five and Six[2]

Section 2 of the Sherman Act prohibits monopolies or attempts to monopolize. 15 U.S.C § 2. "To state a plausible monopolization claim under this provision requires plaintiff to show: '(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury.'" *Somers v. Apple*, *Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010)); *see also Dreamstime.com*, 54 F.4th at 1137. All three elements must be established. *Somers*, 729 F.3d at 963.

---

[2] Oregon courts look to federal antitrust decisions for persuasive guidance in interpreting the state's antitrust laws. *Or. Laborers-Employers Health & Welfare Tr. Fund v. Phillip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999); *Willamette Dental Grp., P.C. v. Or. Dental Serv. Corp.*, 130 Or. App. 487, 492 (1994). Accordingly, the Court applies the same analysis to Plaintiff's federal and state monopolization claims.

"[M]onopoly power means the power to 'control prices or exclude competition.'" *Dreamstime.com*, 54 F.4th at 1137 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). Ninth Circuit precedent instructs that market share is perhaps the "most important factor to consider" when determining if a defendant has monopoly power. *Id.* Thus, to satisfy the first element of a Section 2 claim, a plaintiff must: "(1) define the relevant market, (2) establish that the defendant possesses market share in that market sufficient to constitute monopoly power, and (3) show that there are significant barriers to entering that market." *Id.* (citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997)).

The second requirement of a Section 2 claim is often called the "conduct element," *Image Tech.*, 125 F.3d at 1208, and requires a showing that "the defendant engaged in 'willful' acts to acquire or maintain a monopoly in the relevant market." *Dreamstime.com*, 54 F.4th at 1137 (quoting *Grinnell*, 384 U.S. at 570–71). A Plaintiff must sufficiently allege that a defendant possessing monopoly power engaged in "anticompetitive conduct," *Verizon Commc'ns. Inc., v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004), with an "intent to control prices or exclude competition in the relevant market," *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 736 (9th Cir. 1979). "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).

The third element of a Section 2 monopolization claim is a "plausible antitrust injury." *Somers*, 729 F.3d at 963. The Supreme Court has defined "antitrust injury" as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

The Ninth Circuit has "pars[ed]" that definition into four elements: "'(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Id.* (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir.1999)). To plausibly plead a causal antitrust injury, a plaintiff must plausibly allege that its "loss flows from an anticompetitive aspect or effect of the defendant's behavior" because a plaintiff cannot be compensated for injuries the antitrust laws did not intend to prevent. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (*Rebel* Oil I). Thus, a plaintiff must plausibly allege an injury to competition along with an injury to itself. *Id.* (citing *Atl. Richfield*, 495 U.S. at 334).

### a) <u>Element One: Monopoly Power In the Relevant Market</u>

The first element requires consideration of two factors: a relevant market and monopoly power.

#### i) Relevant Market

Assessing the competitive impact of conduct requires a plaintiff "to prove the relevant market and to show the effects upon competition within that market." *Oltz v. St. Peters Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988); *see also Allied Orthopedic Appliances Inc.*, 592 F.3d at 996, 998 (a plaintiff in a Sherman Act case must plead a relevant product market affected by the alleged anticompetitive conduct). Thus, the threshold question before the Court is whether Plaintiff's Complaint plausibly alleges a relevant product market. *See Dreamstime.com,* 54 F.4th at 1142. "Relevant Market" includes geography along with "the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Oltz*, 861 F.2d at 1446.

Defendants assert that Plaintiff's alleged market of "door-to-door sales of pest-control services in the Portland Market[,]" Compl. ¶ 95, *see also* ¶¶ 9, 94, 96, is not facially sustainable

because it does not include reasonable substitutes—the other ways that pest-control services are marketed to consumers like mailings, online advertisements, sales calls, customer referrals, and television and radio ads. Mot. to Dismiss, 9, 11. Plaintiff counters that this is not just its own market definition; "it is also how Defendants themselves describe the market in which they operate." Resp., 12; *see also* Tr. 36:3–13 (Defendants "own statements make clear that they compete directly with" Plaintiff in the "same specific market that [Plaintiff has] alleged"—the Portland door-to-door pest-control sales market). Thus, according to Plaintiff, its complaint plausibly alleges a facially sustainable relevant market because Defendant Grit has described itself as competing directly with other pest-control companies, including Plaintiff, in the "distinct submarket" in door-to-door sales of pest-control products in Portland. Resp. 12–13.

"Within a general product market, 'well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.'" *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). "To plead an antitrust claim based on a submarket, 'the plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market.'" *Hicks*, 897 F.3d at 1121 (quoting *Newcal Indus. Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)). "[P]ractical indicia" of an economically distinct submarket include: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

Applying the relevant principles here, the Court cannot find that Plaintiff has pleaded a plausible submarket. Plaintiff's proposed submarket market of door-to-door pest-control sales in

the Portland Market is based on: (1) Defendant Grit's description of the relevant market on its website; and (2) the nature of Defendant Grit's business as a specialized vendor. *See* Resp., 13; Tr., 36:3–17. While Defendant Grit's website may describe itself as a specialized "direct-to-home sales" vendor, Compl., ¶ 3, this does not show that door-to-door pest-control sales is economically distinct from the general pest-control sales market. *See Newcal Indus.*, 513 F.3d at 1045. Or said another way, a statement that Defendant Grit specializes in a particular form of advertising pest control does not show that this advertising format is not "reasonabl[y] interchangab[le]" with other ways to market pest-control services. *Id.* The Court finds that because pest-control service providers could reach customers in other ways than through door-to-door sales, Plaintiff's alleged submarket is not facially sustainable. *Hicks*, 897 F.3d at 1120. In other words, Plaintiff's Complaint fails on its face as to the relevant market factor in the first element because the claimed submarket neither alleges substitute advertising formats nor explains why other means of soliciting pest-control customers are not interchangeable. *Brown Shoe*, 370 U.S. at 325; *see Hicks*, 897 F.3d at 1123.

### ii) Monopoly Power

Even if Plaintiff had adequately alleged a submarket, the Court finds that Plaintiff's Complaint fails to plausibly allege that Defendants have monopoly power. *See Dreamstime.com*, 54 F.4th at 1142. A Plaintiff can show monopoly power by direct evidence of the injurious exercise of market power or (more commonly) by "circumstantial evidence pertaining to the structure of the market." *Rebel Oil* I., 51 F.3d at 1434. For a direct-evidence monopoly case, a showing of anti-competitive effects is sufficient. *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).

Plaintiff asserts that this is the more uncommon direct-evidence monopoly case and that it only needs show anticompetitive efforts to plausibly allege monopoly power. Resp., 15. As direct

evidence of Defendants' monopoly power Plaintiff points to the Complaint's allegations that Defendant Grit's team members bragged about their monopoly power. Resp. 16–17. Specifically, that Defendant Grit's team members said that they have successfully "kicked out" other door-to-door pest-control companies from the Portland Market and said that they planned to generate substantial sums of money by barring Plaintiff and other competitors from the Portland Market. *Id.* at 17 (citing Compl., ¶¶ 18, 40–42). But allegations about what Defendant Grit's team members said about Defendant Grit's success in Portland are not sufficient to withstand a motion to dismiss. *See Grinnell,* 384 U.S. at 571 (monopoly power is the "power to 'control prices or exclude competition.'") (quoting *United States v. E. I. du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956)); *see also Bhan*, 929 F.2d at 1413 (to avoid a formal market analysis, a plaintiff must "make a showing of anti-competitive effects").

"Direct evidence of anticompetitive efforts would be proof of *actual* detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (cleaned up) (emphasis added). The Court finds that it is not clear from these allegations—that Grit's team members said that they "kicked out" other door-to-door and pest-control companies in Portland and needed to continue to do so to meet sales goals, Compl., ¶ 18—that Plaintiff can prove a set of facts establishing that Defendant Grit has monopoly power. *See cf. Cost Mgmt. Servs.*, 99 F.3d at 950–51 (finding plaintiff's allegations of actual detrimental effects on the market sufficient to withstand a motion to dismiss); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (allegations must establish "reduced output, increased prices, or decreased quality in the relevant market[.]"). The Court also finds that Plaintiff's allegations of financial losses due to Defendants' aggressive sales tactics similarly fail to plausibly establish monopoly power because Plaintiff does not allege losses in

combination with a raise in prices to supercompetitive levels. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993). The allegation that Plaintiff, a single door-to-door pest-control sales company, was forced out of certain Portland neighborhoods is insufficient to establish that Defendants' tactics substantially restrain competition in the relevant market. *See Bahn*, 929 F.2d at 1413–14 ("the only actual effect shown is that one nurse anesthetist no longer works at one hospital . . . [and] alone is not enough to demonstrate actual detrimental effects on competition."). Accordingly, the Court finds that the Complaint fails to adequately state that Defendants have monopoly power in pest-control sales in Portland so as to satisfy the second factor of the first element.

### b)  Element Two: Acquisition of Market Power (The Conduct Element)

The Court finds that Plaintiff has not sufficiently alleged the second element of a Sherman Act claim—the conduct element—because it has not plausibly alleged that Defendants willfully tried to control the Portland pest-control market. *Trinko*, 540 U.S. at 407 (citing *Grinnell*, 384 U.S. at 570–71; *see also Rebel Oil* I, 51 F.3d at 1433–34 (explaining predatory pricing). Plaintiff charges cancellation fees to customers who terminate their contracts to switch to a competitor. *See* Compl., ¶ 39. Based on Grit's team members' reimbursement of Plaintiff's cancellation fees and going "negative" on sales accounts, Plaintiff alleges that Defendants engage in "predatory pricing and/or bidding with the express purpose of monopolizing the door-to-door pest control sales market" by selling "below cost." *Id.* at ¶¶ 86–90, 97–100. Plaintiff alleges that Defendants recover their losses from paying cancellation fees and selling below cost in "future supra-competitive transactions"—a market situation where a company can set a price above what could be sustained in a normal market. *Id.* at ¶ 100. Although Plaintiff does not allege what Defendant Grit's services and client's products cost, it points to sections of its Complaint quoting Defendant Grit's team

members' recorded statements that they were selling below cost and paying cancellation fees to monopolize the Portland pest-control market. Resp., 20. Plaintiff asserts that the Court should consider Defendants' alleged anticompetitive statements as a whole and find that Plaintiff plausibly alleged anticompetitive conduct. *Id.* at 19–20. What is missing from the Complaint's allegations, even when combined, however, are any facts about Defendant Grit's costs or facts that Defendant Grit suffered losses due to its pricing. *See Vesta Corp. v. Amdocs Mgmt. Co.*, 129 F. Supp. 3d 1012, 1030, 1033 (D. Or. 2015) (citing *Brooke Grp.*, 509 U.S. at 222–24).

Neither Supreme Court nor Ninth Circuit precedent offers guidance on what is the appropriate measure of cost in a predatory pricing case. *Rebel Oil, Inc. v. Atl. Richfield Co.*, 146 F.3d 1088, 1092 (9th Cir. 1998) (*Rebel Oil* II). The Supreme Court *has* held, however, that the bar to allege a predatory pricing scheme is high: "predatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986). "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). Given this direction, the Court cannot find that the Complaint's allegations about Defendant Grit's team members' statements about losses sufficiently allege predatory pricing.

### c)  Element Three: Antitrust Injury

Lastly, the Court finds that Plaintiff fails to adequately state a cognizable antitrust injury, which is required to state a plausible antitrust claim. *See Rebel Oil* I, 51 F.3d at 1433. Plaintiff alleges that it suffered injuries because it was forced from the Portland pest-control services market. Compl., ¶ 64. But being forced from the market does not amount to an antitrust injury. *Janich Bros., Inc. v. Am. Distilling Co.*, 570 F.2d 848, 855 (9th Cir. 1977) ("It is the very nature

of competition that the vigorous, efficient firm will drive out less efficient firms. This is not proscribed by the antitrust laws."); *United States v. Syufy Enters.*, 903 F.2d 659, 669 (9th Cir. 1990) (antitrust laws are meant to foster "an environment where businesses fight it out using the weapon of efficiency and consumer goodwill"). In sum, the Complaint alleges that Plaintiff lost out in the Portland pest-control services market because customers chose a cheaper, competing service. *See* Compl., ¶¶ 17(d), 39, 46. This is not enough to adequately allege the requisite injury to competition. *See Rebel Oil* I, 51 F.3d at 1433.

2.    **OAPDL Claims—Counts Two through Four**

Plaintiff brings three claims under OAPDL based on Defendants sales practices—a claim under ORS 646.040 for price discrimination (Count Two), a claim under ORS 646.070 for special payments to customers (Count Three), and a claim under ORS 646.090 for inducing price discrimination (Count Four). Compl., ¶¶ 65–82. ORS 646.040 and ORS 646.070 are modeled on two provisions of the federal Robertson-Patman Act ("RPA"): 15 U.S.C § 13(a) and 15 U.S.C § 13(d). *See Redmond Ready-Mix, Inc. v. Coats*, 283 Or. 101, 110 (1978). The Oregon Supreme Court has held that federal cases interpreting the RPA are persuasive in interpreting ORS 646.040 and ORS 646.070. *See e.g.*, *Yamaha Store of Bend, Or., Inc. v. Yamaha Mot. Corp., USA*, 310 Or. 333, 338 n.6 (1990) ("Federal cases interpreting the Robinson-Patman Act are persuasive authority in interpreting Oregon's Anti-Price Discrimination Law.").

Congress "passed [the RPA] in response to the problem perceived in the increased market power and coercive practices of chainstores and other big buyers that threatened the existence of small independent retailers." *Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 75–76 (1979). The RPA's legislative history makes clear that Congress enacted it to temper the "evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's

quantity purchasing ability." *FTC v. Morton Salt Co.*, 334 U.S. 37, 43 (1948). Thus, the RPA's purpose is to "assure that all sellers, regardless of size, competing directly for the same customers would receive evenhanded treatment from their suppliers." *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 356 (1968). Indeed, the Supreme Court has held that the RPA "centrally addresses price discrimination . . . between different purchasers for resale of the purchased product." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 169–70 (2006). Consistent with this purpose, the FTC recently initiated an RPA enforcement action against the United States' largest wine and spirit distributor, alleging that the distributor violated the RPA by selling wine and spirits to small independent businesses at drastically higher prices than what it charges large chainstores. *See* FTC Sues Southern Glazer's For Illegal Price Discrimination, https://www.ftc.gov/news-events/news/press-releases/2024/12/ftc-sues-southern-glazers-illegal-price-discrimination (last visited March 6, 2025); *see also* Redacted Complaint (ECF 1), *FTC v. S. Glazer's Wine & Spirits, LLC*, Case No. 8:24-cv-02684, (C.D. Cal. Dec. 12, 2024). Like the federal courts with the RPA, the Oregon courts have only applied the OAPDL to claims brought by a purchaser alleging that a supplier gave more favorable treatment to a competing purchaser where both purchasers sold the same product to consumers. *See e.g.*, *Coats*, 283 Or. at 103 (smaller reseller of pre-mixed concrete alleged that larger concrete manufacturer sold concrete at a lower price to other resellers in a different location).

Plaintiff argues Defendants misread the RPA and the cases interpreting it. Resp., 25–26. For instance, in Plaintiff's reading, the *Supreme* Court in *Fred Meyer* explained that Section 2(a) of the RPA is not limited to suppliers and resellers and applies to any purchaser. *Id.* Plaintiff also argues that the RPL and cases interpreting it do not apply here because it seeks relief under the OAPDL, which is to be construed broadly. Tr. 42:16–43:3. But the Court cannot square these

arguments with the Oregon statutes' text. Specifically, ORS 646.040 expressly refers to the impact on the purchaser's "customers," and ORS 646.070 applies only to payments that are not available to "all other customers competing in the distribution of such products." This language does not support a conclusion that the Oregon statutes apply beyond suppliers and competing purchasers. *See Kupillas v. Sage and Social LLC*, 337 Or. App. 67, 73 (2024) (interpretation of Oregon statutes begins with the text).

Accordingly, because the OAPDL does not apply to the sale of pest-control services direct to consumers, Plaintiff cannot state a viable claim under ORS 646.040, ORS 646.070, or ORS 646.090. Because it is clear that Plaintiff's OAPDL claims cannot be saved by amendment, the Court dismisses them without leave to amend. *See Intri-Plex Techs. v. Crest Grp., Inc.*, 499 F.3d 1048, 1056 (9th Cir. 2007); Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

### 3.     Tortious Interference with Economic Relations—Count One

As to Defendants' challenge to Count One, the Court finds that the Complaint sufficiently states a claim for tortious interference with economic relations. To state this claim, a plaintiff must sufficiently allege "six elements: (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages." *Aitkin v. USI Ins. Servs., LLC*, 607 F. Supp. 3d 1126, 1148 (D. Or. 2022) (citing *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995)).

The Court finds that Plaintiff has at the motion to dismiss stage adequately pled the existence of a professional or business relationship. Such relationships can be shown by allegations of future business relationships, which Plaintiff has sufficiently alleged. *See McGanty*, 321 Or. at

535 (tort protects prospective economic advantages as well as existing contracts and business relationships). Taking the facts in a light most favorable to Plaintiff, the Complaint also sufficiently alleges intentional interference with these relationships by a third party with its claims that Defendant Grit's team members interrupted Plaintiff's during conversations with prospective customers. *See* Compl., ¶¶ 17(a), 38, 40(a). In other words, the Complaint sufficiently alleges that Defendants took steps to prevent sales of Plaintiff's product to prospective customers by interrupting their sales pitches. *See Allen v. Hall*, 328 Or. 276, 285 (1999).

The Court further finds that Plaintiff sufficiently alleges Defendants' wrongful conduct was by improper means or for an improper purpose. *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978). "Improper means can include 'violence, threats or other intimidation[.]'" *Ride PDX, LLC v. Tee & B, LLC*, 322 Or. App. 165, 168 (2022) (quoting *Top Serv.*, 283 Or. at 210 n.11). Plaintiff alleges that Defendant Grit's team members intimidated one of its female direct sellers and physically pushed a male direct seller. Compl., ¶ 40(a), (f). Finally, at this stage of the litigation, the Court finds that the Complaint sufficiently alleges facts that satisfy the final two elements of a tortious interference with economic relations claim—a causal effect between the interference and the harm to the prospective economic advantage and damages. Plaintiff has alleged that Defendants' conduct caused them to lose sales and that it suffered damages from those losses. Compl., ¶¶ 49–64. Accordingly, the Court denies Defendants' motion to dismiss this claim.

///

///

///

///

///

## V. CONCLUSION

Defendants' Request for Judicial Notice (ECF 20) is DENIED.

Defendants' Motion to Dismiss (ECF 19) is GRANTED in part and DENIED in part as follows. Defendants' motion is GRANTED as to Plaintiff's Sherman Act and Oregon state law monopolization claims (Counts Five and Six), which are dismissed with leave to amend, and as to Plaintiff's OAPDL claims (Counts Two, Three, and Four), which are dismissed without leave to amend. Defendants' motion is DENIED as to Plaintiff's tortious interference with economic relations claim (Count One).

The parties' stipulated preliminary injunction remains in effect, and any amended complaint is due thirty days from the date that this Opinion and Order is filed.

IT IS SO ORDERED.

DATED this 18th day of March 2025.


*Amy M. Baggio*
_____
AMY M. BAGGIO
United States District Judge

19 – OPINION AND ORDER